1
2
3

SANDRA WILTCHER, PLAINTIFF
5045 W. CHICAGO CIRCLE SOUTH
CHANDLER, ARIZONA 85226

```
┌─────────────────────────────┐
│ ⌐ FILED     ___ LODGED       │
│ ___ RECEIVED ___ COPY        │
│                              │
│      DEC   7 2012            │
│                              │
│   CLERK U S DISTRICT COURT   │
│     DISTRICT OF ARIZONA      │
│  BY_____ DEPUTY   │
└─────────────────────────────┘
```

4
5

## IN THE UNITED STATES DISTRICT COURT
## OF ARIZONA

6
7
8
9
10
11
12
13
14
15
16
17

| | |
|---|---|
| **SANDRA WILTCHER**, a single woman<br><br>*Plaintiff*(s)<br><br>*vs.*<br><br>**MET LIFE BANK N.A.** d/b/a/**METLIFE HOME LOANS**, a Texas corporation;<br>**FREDDIE MAC**, a Virginia corporation;<br>**QUALITY LOAN SERVICE**, a California corporation;<br>*Defendant*(s) | CASE NO:   CV-12-02603-PHX-DKD<br><br>VERFIED COMPLAINT FOR DAMAGES:<br><br>**VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT; ACTION TO QUIET TITLE; ARIZONA CONSUMER FRAUD ACT; RESPA; TILA;**<br><br>TRIAL BY JURY DEMANDED |

18
19
20

   **COMES NOW**, the Plaintiff Sandra Wiltcher (hereinafter "Plaintiff") complaining of the defendants and each of them as follows:

21
22

## INTRODUCTION

23
24
25

   1.  This action is an action brought by the Plaintiff for declaratory judgment, injunctive and equitable relief, and for compensator, special, general and punitive damaged.

26

   2.  Plaintiffs disputes the title and ownership of the real property in question located at 5045 W. Charleston Circle South, Chandler Arizona 85226, as more particularly described in Exhibit "L" attached hereto and by this reference made a

part hereof (the "Property"), which is the subject of this action. Third party debt collectors, and others alleged to have ownership, have unlawfully sold, assigned and/or transferred their ownership and security interest in a Promissory Note and Deed of Trust related to the Property, and, thus, do not have lawful ownership or a security interest in the Property which is described in detail herein.

3. Plaintiff Sandra Wiltcher alleges that she owns the Property in fee simple, with all rights and appurtenances thereto, and free of any claims or encumbrances alleged by Defendants.

4. Plaintiff alleges that Defendants Metlife Bank, d/b/a MetLife Home Loans, Quality Loan Service, and Freddie Mac cannot show proper receipt, possession, transfer, negotiations, assignment and ownership of the subject property, including the Promissory Note, Deed of Trust, resulting in imperfect security interest and claims.

5. Plaintiff further allege the Defendant, and each of them, cannot establish possession and proper assignment of the Deed of Trust herein; therefore, none of the Defendants have a perfected claim of title or security interest in the Property. Defendants, and each of them, do not have the ability to establish that the mortgages that secure the indebtedness, or Note, were legally or properly acquired.

6. Plaintiff alleges that an actual controversy has arisen and now exists between the Plaintiff and Defendants, and each of them. Plaintiff's desires a judicial determination and declaration of its rights with regard to the Property and the corresponding Promissory Note and Deed of Trust.

7. Plaintiff claims defendants are liable for violations of the Fair Debt Collection Practices Act, and Arizona Consumer Fraud Act, Truth and Lending Act (TILA), Real Estate Settlement Procedures Act (RESPA).

8.  Plaintiff also seeks redress from Defendants identified herein below for damages, for other injunctive relief, and for cancellation of written instruments based upon:

a.  An invalid and unperfected security interest in Plaintiffs Property hereinafter described;

b.  An incomplete and ineffectual perfection of a security interest in Plaintiff subject Property;

c.  A void or voidable Deed of Trust, for which there is a reasonable apprehension that, if left outstanding, may cause a serious injury.

9.  Plaintiff provides this 'caveat' although Plaintiff may plead issues, facts, allegations, and statements upon information and belief, contained in Plaintiffs Complaint. Plaintiff makes clear that in all references as it relates to the terms creditor, mortgagee, servicer, trustee, lender, owner, principle or any other mortgage related term(s) defined within Plaintiffs Deed of Trust, and Promissory Note. Those terms as discussed hereto in Plaintiff's Complaint and at all times relevant does "not" describe, apply to, in any way the capacity of either of the defendants named in this action. Plaintiffs asserts that none of the defendants are party to Plaintiffs Deed of Trust, or Promissory Note, therefore Plaintiff alleges defendants and each of them are deemed strangers to the Plaintiffs mortgage transaction, and thus are mere third party strangers without standing.

A.  Defendants and each of them are for purposes of Plaintiffs action, "debt collectors" as defined by 15 USC§1692a(6), and A.R.S.§44-1521 *et.* seq. Plaintiff makes the following statement clear" Plaintiff is not in Default, meaning there is no Default, Plaintiffs Mortgage and Note has been "paid in full" and there is no debt owed any defendant, and no perfected lien upon Plaintiffs subject property.

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 3-

I.                          **THE PARTIES**

10.  Plaintiff "**SANDRA WILTCHER**" is now and at all times relevant to this action, a resident of the State of Arizona

11.  Defendant "**METLIFE HOME LOANS**", ("MET") is an alleged mortgage lender and or servicer, and subsidiary of MetLife Bank, its principle place of business is located at 4000 Horizon Way, Irving, Texas 75063. Defendant "MET" claims to be the owner and or creditor of Plaintiffs Mortgage and Promissory Note.

12.  Defendant "**FREDDIE MAC** (hereinafter "FM") is a Virginia corporation. Defendant "FM" can be served at its principle headquarters located at 8200 Jones Branch Drive, McLean Virginia 22102. Defendant "FM" claims to be the owner of Plaintiffs Mortgage and Promissory Note.

13.  Defendant "**QUALITY LOAN SERVICE**" (hereinafter"QLS") is a California corporation. Defendant "QLS" can be served at its headquarters located at 2141 5th Avenue, San Diego, CA 92101. Defendant "QLS" claims to be a Trustee of Defendant "MET" and as well of Plaintiffs Deed of Trust.

A.   Plaintiff is a "consumers" as defined by 15 USC§1692a (3). The term consumer means any natural person obligated to or allegedly obligated to pay any debt.

B.  Defendants and each of them are not "creditors" as defined by 15 USC§1692a(4). The alleged debt defendants make claim to is household debt as defined by 15 USC§1692a(5)

C.  Defendants and each of them are "*debt collectors*" as defined by 15 USC§1692a(6). Defendants are attempting to collect an alleged debt, which was for household purposes. The alleged debt at issue in this case upon belief was obtained by each defendant upon assignment and or transfer of the "defaulted debt"15 USC §1692a(4).

14. At all times relevant to this action, Plaintiff is the current title owner of the subject Property located at 5045 W. Chicago Circle South (the "Property").

15. Plaintiff are unaware of the true names, capacities, or basis for liability of Defendants sued herein as Does 1 through 100, inclusive, as each fictitiously named Defendant is in some manner liable to Plaintiffs, or claims some right, title, or interest in the Property. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and therefore alleges, that at all relevant times mentioned in this Complaint, each of the fictitiously named Defendants are responsible in some manner for the injuries and damages to Plaintiffs so alleged and that such injuries and damages were proximately caused by such Defendants, and each of them.

16. Plaintiff are informed and believes, and thereon alleges, that at all times herein mentioned, each of the Defendants were the agents, employees, servants and/or the joint-venturers of the remaining Defendants, and each of them, and in doing the things alleged herein below, were acting within the course and scope of such agency, employment and/or joint venture.

**II.**                                    **JURISDICTION**

17. The US District Court has jurisdiction pursuant to 28 USC§ ¶1332, ¶1331, and 15 USC §1692.

**III.**                                **FACTUAL ALLEGATIONS**

18. Plaintiff Sandra Wiltcher on January 10, 2008, executed a series of mortgage documents, including but not limited to a Note and Deed of Trust, a true correct copy attached hereto as ***Exhibit A***, securing the Property in the amount of $186,200.00 in favor of First Horizon Home Loans. Upon belief First Horizon Home Loans is a subsidiary of First Tennessee Bank Association.

19. Plaintiff upon belief and information obtained from the Securities and Exchange Commission ("SEC") reveals that Plaintiff's loan was subsequently sold

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 5-

into securitization. Plaintiff upon information, belief and evidence obtained alleges Plaintiffs loan was sold to in the secondary market, specifically FHAMS 2007-FA5, which First Horizon was the documented Originator pursuant to the Pooling and Service Agreement.

20.   In 2003, First Horizon securitized and sold $40.9 billion of conventional and federally-insured mortgage loans and had $6 billion in off-balance sheet business trusts for the purpose of securitizing and selling to secondary market investors. First Horizon securitized and sold only $13.8 billion of conventional and federally-insured mortgage loans and reported approximately $24.5 billion in off-balance sheet business trusts related to secondary market securitizations and sales. First Horizon's proprietary securitizations of nonconforming first-lien and second-lien mortgages and home equity loans did not conform to the standards for sale or securitization to government agencies and created risks that there might not be an adequate market for such securities, risks which were not adequately disclosed. First Horizon also failed to disclose or adequately disclose various risks related to its changed business model including the extent to which recourse could be sought from First Horizon on securitized loans, the increasing risks associated with its shift to off-balance sheet transactions, and how it could affect the levels of Level I and II capital held. While First Horizon claimed to adequately manage the risks associated with the sale and securitization of its loans, it knew, when Plan participants did not and could not know, the facts and risks associated with First Horizon's risk management.

21. On July 19, 2007, First Horizon Stock closed at $37.74 per share, down 24 cents. Over the next three months, First Horizon's share price decreased approximately 20%, reaching $29.65 on September 11, 2007. The July 19, 2007 press release also announced that First Horizon would pursue the sale, closure or consolidation of 34 branches in its four national full service banking markets of

Atlanta, Baltimore, Dallas and Northern Virginia, while continuing to offer mortgage loans in these markets through First Horizon Home Loan Corporation.

22. On September 12, 2007, Baker announced plans to cut up to 50 percent of First Horizon's mortgage sales force and shrink the real estate portfolio on its balance sheets by making further changes in its consumer and construction lending businesses. At that time, First Horizon noted that it was not planning to grow. Instead, it was shrinking and cutting back as well as planning to make other adjustments, including:

     • Shrinking the real estate portfolios on its balance sheet by making further changes in its consumer and construction lending business. New originations are expected to decline significantly as a result of continued product and program changes and the retention of only the most productive sales people.

23. On or about June 4, 2008, First Horizon announced that it had agreed to sell its mortgage business outside of Tennessee to <u>MetLife Bank</u> for approximately $400 million. The deal included First Horizon's 230 offices in its loan-origination business and its right to "**service**" $20 billion in mortgages. In addition, the agreement provides that MetLife will "**service**" $65 billion of first mortgages that First Horizon is retaining for now but will try to sell over the next few years. First Horizon estimated that it would take $50 million to $70 million in pre-tax charges related to both the MetLife deal and other expenses in the mortgage division.

24. Plaintiff had been current on her payments until recently, when it was discovered the defendant "MET" may not be the secured party creditor, and entitled to payment. Plaintiff is fully aware of the mortgage crisis and the magnitude of fraud surrounding the collapse of the real estate industry due to it.

25. Plaintiff has a legal right to know who holds her genuine original promissory Note, and mortgage. Plaintiff also has a contractual agreement in writing with the original party First Horizon that appears to have been breached.

Plaintiff brings this action due to multiple failures by "MET" to provide accurate and specific details as it relates to the servicing, creditor, amounts due and owing, and other pertinent information relating to "MET" capacity.

26.  Plaintiff discovered by investigating property records held by the Maricopa County Recorders' Office, found several documents recorded by defendants "MET" and "QLS". The recorded documents are as follows:

1. Corporation Assignment of Deed of Trust (hereinafter"ADOT") recorded on June 28, 2012 as document No. <u>20120567762</u>; (referred to as "***Exhibit B***")

2. A second identical Corporate Assignment of Deed of Trust (hereinafter"ADOT") recorded on July 24, 2012 as document No. <u>20120647929</u>; (referred to as "***Exhibit C***")

3. Notice of Substitution of Trustee (hereinafter "SOT") recorded on August 28, 2012 as document No. <u>20120771238</u>; (referred to as "***Exhibit D***")

4. Notice of Trustee Sale (hereinafter "NOTS") recorded on August 31, 2012 as document No. <u>20120788976</u>; (referred to as Exhibit E) Plaintiff points out the fact that this Notice of Default is <u>"unsigned", "undated" and not "notarized"!</u> (referred to as "***Exhibit E***")

27.  A true and correct copies of these documents are attached as "***Exhibits B, C, D, E***" respectively.

28.  The purported documents filed into Plaintiff title records in Maricopa County recorders' office, is the basis and subject of Plaintiff's concerns which resulted in Plaintiff filing this action. Specifically the Plaintiff will focus on the two proffered Corporation Assignment of Deed of Trust (*see*, "Exhibit B, C"). For all intense and purposes the two separate filings performed on June 28, 2012, and July 24, 2012, are identical in content. However it appears the MERS Assignment

of Deed of Trust has substantial patent defects that may render it void and in violation of the Deed of Trust.

29. Plaintiff will avoid a lengthy legal discussion on the topic of MERS issues. However the Plaintiff will state for the record that the Assignment of Deed of Trust was not authorized by the Lender as specifically plead in the language of the Deed of Trust. Plaintiff for the record also alleges at the time of execution of the Assignment, MERS had no interest in the Deed of Trust to assign to defendant "MET". Notwithstanding, defendant "MET" Assignment of Deed of Trust purports to assign *"all beneficial interest under that certain Deed of Trust dated January 10, 2008".*

30. In viewing the proffered Assignment it clearly states defendant "MET" was allegedly assigned Plaintiff's Deed of Trust only. Therefore it appears within the four corners of the assignment, defendant "MET" was the recipient of bare legal title, *if that*. Notwithstanding what is clear is the fact Plaintiffs promissory Note remains unaccounted for, and omitted from defendants "MET" corporate assignment. Although the Plaintiff is fully aware of the fact MERS never holds any promissory Notes, Plaintiff is not ignorant of this fact. Plaintiff is however aware that the "DOT" language is the first controlling law, as it is a contract between the real parties. Any breach of the contract by either party, may be grounds for damages, by the party that causes such breach(s). Here as it appears defendant "MET" has numerous flaws and defects that must be addressed. The first issue is the manner in which a 'party to the contract" be it Lender/creditor, or Plaintiff for that matter. The "DOT" language reads as follows;

"**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other

mortgage loan servicing obligations under the Note, this Security, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser."

31. The clear language of the "DOT" is in clear contradiction with defendants "MET" for several reasons. First the "ADOT" is not executed by the Lender, secondly defendant "MET" MERS"ADOT" only assigned the "DOT" not Plaintiffs Note. Aside from the obvious fact of bifurcation, the "ADOT" was not executed by the Lender and or creditor, and fails to show any sale of Plaintiff's Note. Further Plaintiff asserts the fact that since Plaintiff's Note was securitized and thereby converted into a security, negotiation of Plaintiffs Note would not suffice, and or be applicable pursuant to Article 3 of the Uniform Commercial Code. At this point Plaintiff finds no reason to belabor that matter, as defendant "MET" "ADOT" failed to take possession of the Plaintiffs Note. "MERS is not an economic 'beneficiary' under the Deed of Trust. It is owed and will collect no money from Plaintiff under the Note, nor will it realize the value of the Property through foreclosure of the Deed of Trust in the event the Note is not paid." If MERS is only the mortgagee, without ownership of the mortgage instrument, it does not have an enforceable right. See Vargas, 396 B.R. 517 ("[w]hile the note is 'essential,' the mortgage is only 'an incident' to the note" [quoting Carpenter v. Longan, 16 Wall. 271, 83 U.S. 271, 275, 21 L. Ed 313 (1872)]). For this reason and others the MERS "ADOT" fails in that defendant "MET" is not an agent of the

1   principle. Lastly defendant "MET" from its own language contained in the

2   defective "ADOT" was not assigned Plaintiff's Note.

3   32. In addition to this defendant "MET" could not have had standing to issue

4   any of the subsequent notices and filings, specifically the Substitution of Trustee

5   (*see*, Exhibit C, D) which purports to authorize defendant "QLS" as an alleged

6   Trustee as it relates to Plaintiffs "DOT". Plaintiff therefore denies the fact that any

7   of the communications, notices, and letters that may have been received, have any

8   legal merit in law, and or as it relates to Plaintiffs "DOT". Plaintiff will also

9   address briefly the fact that at the time of defendant "MET" MERS "ADOT" the

10   original party to the "DOT" in First Horizon was not the principle and or creditor.

11   Plaintiffs Note was securitized and owned by FHAMS 2007-FA5, which means the

12   original party in First Horizon was paid in full for Plaintiff Note. Plaintiff in this

13   case would have great concern in that defendant "MET" by and through the MERS

14   "ADOT" would not have had even legal title to convey, if any. Lastly Plaintiff was

15   entitled to Notice of any sale of Plaintiffs promissory Note, as well notice within

16   30 days of the sale of Plaintiffs Note is required pursuant to 15 USC§1641(g)

17   TILA. (DOT¶20.)

18

19   33. On or about July 2, and 3rd, 2012, Plaintiff received two letters from

20   defendant "MET" a true and correct copy of such notices are attached hereto as

21   ***"Exhibit F and G".*** The proffered notices are styled "Mortgage in Default Two

22   Months" and "Delinquent Notice". The Plaintiff wholly denies that the proffered

23   notices comply with the provisions set forth in Plaintiff's DOT, as well Plaintiff

24   denies any of the defendants are legal parties to Plaintiffs Note and DOT. The

25   notices sent Plaintiff by defendant "MET" failed to comply in the least bit with the

26   provisions set forth in Section ¶22 of Plaintiffs DOT which reads as follows;

//////

//////

//////

//////

//////

//////

//////

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

34. In in plain language of the Deed of Trust it clearly states the "Lender" shall give Notice to Borrower prior to acceleration……(¶22), it further goes on to state if "Lender" invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of "Lender's" election to cause the Property to be sold (¶22, para.2) In light of the clear language as written in the DOT, defendant "MET" corporate Assignment does not appear to comply with these express terms.

35. On or about July 5, 2012 Plaintiff received yet another confusing, deceptive document, this time from defendant "FM". A true and correct copy of this notice is attached hereto as ***"Exhibit H".*** The proffered letters purports to inform the Plaintiff that defendant "FM" is the alleged "owner" of Plaintiffs Mortgage. (not Plaintiffs promissory Note). It further alleges that defendant "MET" is the

"servicer" on behalf of defendant "FM". Notwithstanding the fact that Plaintiff found this notice to be just as confusing and worth investigation, in addition to all previous notices aforementioned. Plaintiff makes clear of the fact that defendant "FM" could not at all be the owner of Plaintiffs Note and mortgage, for reasons already stated. However for pleading purposes, defendant "FM" is not a party to Plaintiffs "DOT", neither defendant "MET" or "FM" ever lent Plaintiff any funds associated with Plaintiff mortgage transaction on January 10, 2008. In fact Plaintiff asserts t¹hat even the original party in First Horizon, appears to not have been the source of the funds. Since Plaintiffs Note was securitized, sold and purchased by the Special Purpose Vehicle, who then paid First Horizon in full.

36. Defendant "FM" dunning letter to Plaintiff alleging ownership of Plaintiff's mortgage and Note completely contradicts all previous notices sent by defendant "MET" who consistently claimed they were the creditor. Indeed both defendants in "MET" and "FM" are contemporaneously claiming "creditor" status, however in light of the documents hereto attached as *Exhibits B-H*, it appears clear that neither of the defendants have any legal claim as it relates to Plaintiffs subject property. The defendants and each of them *alleged* claims are clear on for the record, and supported by defendants own proffered document's, and more fully described in defendants recorded documents in the Maricopa County Recorders' Office. That is defendant "MET" claims they were assigned Plaintiffs mortgage only by MERS who lacked standing to issue such assignment for reasons set forth above.

37. The facts are painfully clear and cannot be denied, that defendant "MET" claims to be the owner of Plaintiff mortgage and Note, who authorized defendant "QLS" to execute a "Substitution of Trustee" in favor of "QLS". Defendant "QLS"

---

[1] Defendant "FM" July 5, 2012 notice claiming they were owner of Plaintiffs mortgage and loan was followed by the subsequent filing of defendant "MET" Corporate Assignment of Deed of Trust. The Assignment of Deed of Trust alleges the mortgage was assigned to defendant "MET". "MET" has always claimed it was Plaintiffs creditor and principle, "MET" has "never" claimed in any of it notices that it was a servicer for defendant "FM".

then executed a series of documents, which consisted of an "undated", "unsigned,"unotarized", Notice of Trustee Sale (see, "Exhibit D") recorded in Plaintiff's property records located in the Maricopa County Recorders' Office.

38. On or about August 9, 2012 due to Plaintiffs obvious concerns in the recorded documents filed in Maricopa County Recorders' Office, Plaintiff served defendant "MET" with the first of two Qualified Written Requests ("QWR"), Notice of Dispute in compliance with 12 USC§2605e, 15 USC§1641g, and 15 USC§1692.

39. On August 9, 2012, Plaintiff served defendant "MET" with a second Qualified Written Request ("QWR") pursuant to 12 USC§2605e, 15 USC§1641g, and 15 USC§1692. A true and correct copy of Plaintiff "QWR" is attached hereto as *"Exhibit I* and *J"*.

40. Defendant "MET" responded although untimely, to Plaintiffs request, a true and correct copy of that response is attached hereto as *"Exhibit J"*.

41. Plaintiff served yet another "QWR" on or about October 9, 2012 due to defendants "MET" erroneous response to Plaintiffs "QWR", whereby it alleged it was the secured party creditor, subject to payment, and authority to issue such Notices of Default and subsequent foreclosure.

42. A true and correct copy of defendant "MET" response to Plaintiff's "QWR's" is attached hereto as *"Exhibit K"*. Initially Defendant "MET" stayed on course in its position that it was Plaintiffs creditor, and principle to which the alleged debt was owed, in its first response dated September 10, 2012. However once again defendant "MET" changed capacities without any supporting documents (i.e. in an Assignment) that gives any validity to these now unusual change of capacity.

43. Defendant "MET" now claims in its letter as read, "Your **"investor"** is Freddie Mac, their contact information. Plaintiff in reading this response, was

further confused as the term "investor" is absent from any contract in Plaintiffs possession. Upon Plaintiffs belief and information, the term "investor" is synonymous with that of a debt collector, and or debt buyer, and or securitization investor/party. Indeed the term "investor" and owner are not one in the same, and Plaintiff has no obligation to an "*investor*", and notwithstanding the Plaintiff has a right to know who "owns" Plaintiffs loan. Plaintiff also has a right to know where her payments are going and whether it is going to the proper principle.

44. Plaintiff must ensure the proper party receiving payment can and will provide clear title upon satisfaction of Plaintiffs mortgage obligation. Plaintiff can refuse to remit payments to any entity just because of idle demands. In this case substantial conflicting recorded documents, ambiguous notices, material latent and patent defects in notices has caused Plaintiff confusion and alarm.

45. Plaintiff alleges the following facts, *abinitio*:

1. On or about January 2008, the original party in First Horizon, sold and otherwise attempted securitization of Plaintiffs Note to FHAMS-FA5.

2. On or about June 2008, First Horizon a subsidiary of First Tennessee Bank, sold defendant "MET" "<u>only servicing rights</u>" of first lien securitized mortgages. First Horizon at the time it sold defendant "MET" these servicing rights, was only servicers themselves of REMICS on behalf of the MBS investors.

3. Defendant "MET" alleged assignment of Plaintiffs Deed of Trust purports to convey Plaintiffs mortgage, and only bare legal title, however Plaintiffs promissory Note remains unaccounted for. Notwithstanding defendant "MET" was not assigned Plaintiffs Note, therefore "MET" has no legal standing to demand payment from Plaintiff. Defendant "MET" is not Plaintiffs principle or creditor, and never lent Plaintiff any funds as it relates to Plaintiffs mortgage transaction. Defendant "MET" was obligated to send certain notices as required and written in

Plaintiffs Deed of Trust, and pursuant to 15 USC§ 1641g, and 15 USC§1692 amongst other laws.

4. Defendant "QLS" executed two Maricopa County filed documents, specifically a Substitution of Trustee, and a undated, unstamped, unsigned, unnotarized, Notice of Trustee Sale. Defendant "QLS" lacked authority to execute such documents, as defendant "MET" lacked standing to substitute "QLS" as Trustee. Further, even if defendants "MET" and "QLS" had such authority to execute those notices, they failed to comply with the language and provisions set forth in Plaintiffs Deed of Trust.

5. Defendant "FM" is not an original party to Plaintiffs mortgage transaction, and has never lent Plaintiff any funds associated with Plaintiff's subject property. Defendants "MET" and "FM" simultaneously claims to be the owner of Plaintiffs mortgage and promissory Note. Defendant "FM" also claims to be an "investor" although no such term is defined in any of Plaintiffs mortgage documentation. "FM" has no legal documentation that supports either of its allegations that it is Plaintiffs creditor, owner, or even the self -appointed vague term of investor.

6. Defendant "FM" sent dunning notices to Plaintiff demanding payments, and notifying Plaintiff that they were "owner" of Plaintiffs mortgage and Note. Defendant "FM" further sent conflicting and contradicting notices to Plaintiff, that were vague, ambiguous, or in the interim, outright false. Defendant "FM" never sent notice to Plaintiff regarding the fact "FM' became the legal owner of Plaintiffs mortgage and Note. If in fact it is discovered by admissible evidence that defendant "FM" is "creditor" then it was required to serve notice upon the Plaintiff as written in Plaintiffs Deed of Trust. Defendant "FM" was also required to send notice to Plaintiff pursuant to 15 USC 1641g, and 15 USC§1692 amongst other requirements.

7. All defendants are debt collectors as defined by 15 USC§1692a (6), and A.R.S.§44-1521. Even if defendants are found to be secured party creditors, mortgage servicers, principals, or agents for the principal, they are governed and obligated to act in compliance with the TILA, RESPA, Dodd Frank Act and other federal and state laws.

8. Plaintiff never received notices as required by Plaintiffs Deed of Trust, 15 USC§1641g, 15 USC§1692, 12 USC§2605e, A.R.S.§44-1521 *et,* seq.

## IV.                    FIRST CAUSE OF ACTION
### QUIET TITLE
(Defendants Freddie Mac, and MetLife)

46. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

47. Plaintiff is credibly informed and believes that Defendants claim an interest or interests in the Property that are adverse to Plaintiff's fee simple title to the property.

48. Plaintiff is entitled to equitable relief by a judicial decree and order declaring Plaintiff to be the title owner of record of the Property and quieting Plaintiff's title therein and thereto subject only to such legitimate liens and encumbrances as the Court may deem valid and avoiding any liens or encumbrances upon the Property created by Defendants or by their putative predecessors, or by any of them.

49. Plaintiffs desires and is entitled to a judicial declaration quieting title in Plaintiffs as of the date on which is loan transaction was consummated.

50. Plaintiffs verifies the truth of the allegations contained herein for the purpose of complying with the requirement set forth in ARS§12-1102 that a Complaint for Quiet Title be given under oath. Plaintiff's Verification Under Oath is attached hereto and by this reference made a part of this Complaint.

51.  Plaintiff's moves this court to require the defendant to provide the genuine, original Note and a clear chain of title to the Plaintiff as proof that is it the true party to which the debt is owed, so that Plaintiff could satisfy and or tender any alleged payment due, and or satisfy the debt if any.

V.              **SECOND CAUSE OF ACTION**
**VIOLATION OF 15 U.S.C.§1641(g) TRUTH IN LENDING ACT**
(All Defendants)

52.  Plaintiff re-allege the allegations above as if fully set out herein.

53.  With respect to Plaintiff defendants "FM' and "MET" alleges to have received by assignment a beneficial interest in their mortgage and note. Defendants alleges it is a creditor within the meaning of 15 U.S.C.§1641(g).

54.  Defendants allege they are "creditors" within the meaning of 15 U.S.C. §1641(g), although no evidence supports these allegations.

55.  Said mortgage secures an interest in real estate which is used by Plaintiff as their principle dwelling, such transfer, within 30 days, and make all the required disclosures set out above.

56.  Defendants failed to notify Plaintiff at all, and therefore failed to make the requisite disclosures.

57.  Plaintiff was harmed by the willful and negligent acts of each of the defendants, whereby defendants' failures caused uncertainty, confusion, emotional stress damages among others. Defendants' acts also caused damages to Plaintiff in that Plaintiff refrained from making payments to defendants due to the conflicting notices, and contradicting claims of ownership.

58.  Therefore defendants are liable under TILA §131, for its failure to provide such information, including statutory damages in the amount of $4,000.00 for each

1   of the two violations, actual damages if any be proven, reasonable attorney's fees,

2   and costs expended in this proceeding.

3

4   **VI.              THIRD CAUSE OF ACTION**
   **VIOLATION OF THE FAIR DEBT CREDIT PRACTICES ACT**

5   (All Defendants)

6   59. Plaintiff re-allege the allegations above as if fully set out herein. Plaintiff sent

7   defendants two QWR's and two Notices of Dispute. (*see unsigned*, Exhibits I, J)

8   60. Plaintiff claims each of the defendants are liable to Plaintiff for violations of

9   15 U.S.C.§1692, specifically 15 U.S.C.§1692e. Defendant's use of false,

10  deceptive, and/or misleading representation with the collection of any debt

11  constitutes violation(s) of the act.

12  61. Plaintiff' claims each of the defendants are liable to Plaintiff, for violations of

13  15 USC§1692e (4) which prohibits debt collectors from making false

14  representations that nonpayment of any debt will result in the seizure of any

15  property unless such action is lawful.

16  62. All Defendants engages in the collection of debts from consumers, using the

17  mail and telephone. Defendants regularly attempts to collect consumer debts

18  alleged to be due to another. Defendants are "debt collectors" as defined by the

19  FDCPA, 15 U.S.C.§1692a(6). Defendants violated the FDCPA, and caused

20  damages to Plaintiff by their failure to comply with the Act. Defendant's violations

21  include, but are not limited to the following;

22

23        a.  Defendant violated §1692d of the FDCPA by engaging in conduct the

24            natural consequences of which is to harass, oppress, or abuse any person

25            in connection with the collection of an alleged debt and;

26        b.  Defendant violated §1692(d)(5) of the FDCPA by causing a telephone to

            ring engaging any person in telephone conversation repeatedly and/or

continuously with the intent to annoy, abuse or harass any person at the called number and;

c. Defendant violated §1692(j) of the FDCPA by using unfair or unconscionably means in connection with the collection of an alleged debt;

d. Defendant violated 1692(e) using false, deceptive, or misleading misrepresentations or means in connection with the collection of a debt, in violation of 15 U.S.C.§1692e, and;

e. using unfair or unconscionable means to collect or attempt to collect a debt, in violation of 15 U.S.C. §1692f;

f. Defendant violated the 1692(e)(8) requires debt collectors to communicate the disputed status of a debt if the debt collector 'knows or should know' that the debt is disputed, standard requires no notification by the consumer, written or oral, and instead, depends solely on the debt collector's knowledge that a debt is disputed, regardless of how or when that knowledge is "acquired."

63. Defendant's acts as described above were willful, intentional, malicious, and with intent confuse, mislead, and distract Plaintiff by coercing the Plaintiff to pay defendants on the alleged debt.

64. As a result of the foregoing violations of the FDCPA, Defendants, and each of them are liable to the Plaintiff pursuant to 15 USC§ 1692k. Plaintiff is entitled to statutory damages of $1000.00, actual damages, punitive damages, costs and fees, to be determined at trial.

/////

/////

/////

1

**VII.**              **FOURTH CAUSE OF ACTION**
2                **VIOLATION OF RESPA 12 USC§2605**
                       (Defendant MetLife)
3    65. Plaintiff re-allege the allegations above as if fully set out herein.

4    66. Plaintiff's August 9, and October 9, 2012, Plaintiff sent a letter to Defendant

5    "MET" styled a "qualified written request" as defined in § 6(e)(1)(B) of the Real

6    Estate Settlement Procedures Act ("RESPA") [12 U.S.C. § 2605(e)(1)(B)]. Thus

7    Plaintiff's letters had the dual effect of invoking Plaintiff's rights under TILA §

8    131(f), 15 USC§1692 as well Plaintiff's rights under RESPA § 6(e)(1). 12§ USC

9    2605e (1)(A) as amended effective July 16, 2010 by the Dodd Frank Financial

10   Reform Act and Reg.X Section 3500.21(e) (1).

11   67. The Defendant did not respond within 20 days to Plaintiff's request for the
12
     name of the owner and holder of the First Mortgage Note as required by § 6(e)(1)
13
     of RESPA [12 U.S.C. § 2605(e)(1), and as recently as October 9, 2012 has never
14
15   provided Plaintiff with a complete and or unambiguous response, thus violating

16   both 12 U.S.C.§2605(e)(1) (RESPA) and 15 U.S.C.§1641(f) (TILA) with respect

17   to the First Mortgage Loan.

18   68. Defendants failure to respond to Plaintiffs requests constitutes violations of

19   Title 12 USC§2605, and are therefore liable to Plaintiff in the amount of $2000.00

20   per violation (2). Plaintiff sent defendant 'MET" two such notices.

21   **VIII.**              **FIFTH CAUSE OF ACTION**
                            **BREACH OF CONTRACT**
22                           (All Defendants)

23   69. Plaintiff re-allege the allegations above as if fully set out herein.

24   70. Defendants and each of them allege they are party to Plaintiffs Deed of Trust

25   and promissory Note. Defendants' willful acts as alleged in Plaintiff's Complaint,

26   constitute a Breach of Contract pursuant to Plaintiffs Deed of Trust.

71. Specifically defendants documents filed in the Maricopa County Recorders' Office, (*see*, Exhibits B, C, D, E) was not in compliance with the express terms and language contained in Plaintiffs Deed of Trust.

72. Defendant "MET" sent notices styled "Mortgage in Default", and "Delinquent Notice", these notices were not in compliance with the Deed of Trust. Defendant "FM" sent notice to Plaintiff, demanding payment. (*see*, Exhibit H) Defendant "FM"s notices does not comply with the notice provisions as written in Plaintiffs Deed of Trust.

73. As a result of the allegations herein the Defendants has failed to comply with the terms of a Plaintiffs Deed of Trust. Defendants are therefore liable for Breach of Contract, Plaintiffs are entitled to the recovery of actual damages, punitive damages, cost and fees.

**IX.**                    **SIXTH CAUSE OF ACTION**
**VIOATION OF ARIZONA CONSUMER FRAUD ACT**
**ARS 44-1521 *et*, seq.**
(All Defendants)

74. Plaintiff restates, re-alleges, and incorporates by reference the allegations contained in each of the preceding paragraphs as though fully set forth herein. Defendants and each of them, through their agents, employees and others acting on their behalf or at their direction, have employed deception, deceptive acts or practices, fraud, false pretenses, false promises, misrepresentations or concealment, suppression or omission of material fact with the intent that others rely on such concealment and/or suppression or omission in violation of A.R.S. § 44-1522(A).

75. In particular Defendants have, *inter alia*, engaged in deceptive acts by and through the notices, letters, responses, correspondences as clearly evidenced in ***Exhibits B-H.*** Defendants' acts have caused damages to the Plaintiff, therefore Plaintiff is entitled to statutory, actual, punitive damages, cost and fees consistent with said statute.

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 22-

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs requests the following relief to be awarded for each Cause of Action:

1. That this Court establish estate in fee simple in the Property and that Defendants MetLife and Freddie Mac be barred and forever estopped from having or claiming any right or title to the Property adverse to Plaintiff;

2. For Declaratory Relief, including the following Decrees of this Court that:

   a. Plaintiff is the prevailing party;

   b. The Mortgage Originator, and any subsequent assignees have no enforceable secured or unsecured claim against the Property; and for an Order Quieting Title;

   c. For judgment for statutory damages, costs and fees pursuant to 15 §U.S.C.§1641(a);

   d. For Declaratory judgment that Defendant's conduct violated the 15 USC§1641g, and A.R.S.§44-1521;

   e. Actual, and consequential damages in an amount determined at trial;

   f. Punitive damages in an amount determined at trial;

   g. statutory damages of $1000.00 per violation, plus actual and punitive damages of law pursuant to 15 U.S.C.§1692k.

   h. costs and fees pursuant to 15 U.S.C. §1692k.

   i. Awarding Plaintiff any pre-judgment and post-judgment interest as may be allowed under the law.

   h. statutory damages of $4000.00 for violations of 12 USC§2605(f)(g) ,TILA 131(f)(g) actual and punitive damages, and any other such damages deemed appropriate by the court.

1

i. For any such other relief to be determined by the court.

2

3    **VERIFICATION OF PLAINTIFF UNDER OATH**

4        I, Sandra Wiltcher affirm under oath that we have read the foregoing

5    Complaint, and that the information contained therein is true and correct, based

6    upon personal knowledge and upon information and belief.

7

8    Dated; December 6, 2012

9

10

11                                    Sandra Wiltcher, *Plaintiff*

12                                    5045 W. Chicago Circle South
                                     Chandler, Arizona 85226

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**EXHIBIT A**
**DEED OF TRUST**

**ARIZONA TITLE AGENCY, INC.**

OFFICIAL RECORDS OF

**Unofficial Document**

Return To:
FHHL - POST CLOSING MAIL ROOM

1555 W WALNUT HILL LN #200 MC 6712
IRVING, TX 75038

Prepared By:
FIRST HORIZON HOME LOANS,
A DIVISION OF FIRST TENNESSEE BANK N.A.
2375 EAST CAMELBACK ROAD, SUITE 380
PHOENIX, AZ 85016

 1/1 070/2/91-310 [Space Above This Line For Recording Data]

0062743018

# DEED OF TRUST

MIN 100085200627430186

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated     January 10th, 2008              ,
together with all Riders to this document.
(B) "Borrower" is
SANDRA WILTCHER, An Unmarried Woman

Borrower is the trustor under this Security Instrument. Borrower's mailing address is
5045 W. CHICAGO CIRCLE SOUTH, CHANDLER, Arizona 85226
(C) "Lender" is FIRST HORIZON HOME LOANS,
A DIVISION OF FIRST TENNESSEE BANK N.A.
Lender is a  NATIONAL BANK
organized and existing under the laws of   THE UNITED STATES OF AMERICA

ARIZONA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Form 3003 1/01
(rev. 6/02)
-6A(AZ) (0610)
Page 1 of 15                Initials:
VMP Mortgage Solutions, Inc.



20080043144

Lender's mailing address is   **4000 HORIZON WAY,**
**IRVING, TEXAS 75063**
(D) "Trustee" is   **ARIZONA TITLE**
2398                              #650                              . Trustee's mailing address is
**3456 E. CAMELBACK ROAD, #655, PHOENIX, AZ 85016**

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this
Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated   **January 10th, 2008**
The Note states that Borrower owes Lender

**ONE HUNDRED EIGHTY SIX THOUSAND TWO HUNDRED & 00/100**                              **Dollars**
(U.S. $        **186,200.00**  ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   **FEBRUARY 1, 2038**                              .
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

**0062743018**
**-6A(AZ)** (0510)                              Page 2 of 15                  Initials:        Form 3003  1/01 (rev. 6/02)

20080043144

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County _____ of Maricopa                    ;
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

LOT 349, TWELVE OAKS II, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 287 OF MAPS, PAGE 43.

Unofficial Document

Parcel ID Number: County: 301-88-644-9 City:                    which currently has the address of
5045 WEST CHICAGO CIRCLE SOUTH                    [Street]
CHANDLER                    [City], Arizona   85226   [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

0062743018
-6A(AZ) (0510)                    Page 3 of 18                    Form 3003  1/01 (rev. 6/02)

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 28-

20080043144

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in

-6A(AZ) (0610)                    Page 4 of 15                2003  1/01 (rev. 6/02)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

20080043144

writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within

-6A(AZ) (0510)                              Page 6 of 16                     Initials: [signature]                  Form 3002  1/01 (rev. 6/02)

20080043144

10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if

-6A(AZ) (0610)                    Page 6 of 16                    Form 3003 1/01 (rev. 6/02)

20080043144

any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to

-6A(AZ) (08/10)                    Page 7 of 16                    Initials: _____ Form 3003 1/01 (rev. 6/02)

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 32-

20080043144

protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

-6A(AZ) (0510)                                    Page 8 of 15                    Initials:    Form 3003  1/01 (rev. 6/02)

20080043144

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

-6A(AZ) (0810)                    Page 8 of 15                    Initials: [signature]    Form 3003 1/01 (rev. 6/02)

20080043144

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

-6A(AZ) (0810)                     Page 10 of 16                     Initials: ___     Form 3003 1/01 (rev. 6/02)

20080043144

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in

-6A(AZ) (0810)                    Page 11 of 15                    Initials: [signature]  Form 3003 1/01 (rev. 6/02)

20080043144

connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

-6A(AZ) (0810)          Page 12 of 16          Initials:          Form 3003 1/01 (rev. 6/02)

20080043144

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Time of Essence. Time is of the essence in each covenant of this Security Instrument.

-6A(AZ) (0510)                    Page 15 of 18            Initials:  Form 3003  1/01 (rev. 6/02)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

20080043144

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                                                SANDRA WELTCHER          -Borrower

_____    _____ (Seal)
                                                                         -Borrower

_____ (Seal)    _____ (Seal)
                       -Borrower                                         -Borrower

Unofficial Document

_____ (Seal)    _____ (Seal)
                       -Borrower                                         -Borrower

_____ (Seal)    _____ (Seal)
                       -Borrower                                         -Borrower

0062743018
-6A(AZ) (0810)              Page 14 of 16              Form 3003 1/01 (rev. 6/02)

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 40-

20080043144

STATE OF ARIZONA,        MARICOPA                    County ss:

The foregoing instrument was acknowledged before me this    01|11|08
by   SANDRA WILTCHER

My Commission Expires:
09|09|08





Notary Public

Unofficial Document

0062743018
-6A(AZ) (0510)                    Page 16 of 16               Form 3003 1/01 (rev. 6/02)

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 41-

20080043144

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this      10th       day of
January, 2008                                    , and is incorporated into and shall be
deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the
"Security Instrument") of the same date, given by the undersigned (the "Borrower") to
secure Borrower's Note to
FIRST HORIZON HOME LOANS,
A DIVISION OF FIRST TENNESSEE BANK N.A.
(the "Lender") of the same date and covering the Property described in the Security
Instrument and located at:
5045 WEST CHICAGO CIRCLE SOUTH, CHANDLER, Arizona 85226

[Property Address]
The Property includes, but is not limited to, a parcel of land improved with a dwelling,
together with other such parcels and certain common areas and facilities, as described in
Covenants, Conditions and Restrictions of Record

(the "Declaration"). The Property is a part of a planned unit development known as

TWELVE OAKS

[Name of Planned Unit Development]
(the "PUD"). The Property also includes Borrower's interest in the homeowners association
or equivalent entity owning or managing the common areas and facilities of the PUD (the
"Owners Association") and the uses, benefits and proceeds of Borrower's interest.
    **PUD COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
    **A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the
PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii)
articles of incorporation, trust instrument or any equivalent document which creates the
Owners Association; and (iii) any by-laws or other rules or regulations of the Owners
Association. Borrower shall promptly pay, when due, all dues and assessments imposed
pursuant to the Constituent Documents.

0062743018
**MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT**
Form 3150 1/01
                                         Page 1 of 3                   Initials: 
-7R (0411)        VMP Mortgage Solutions, Inc. (800)521-7291



20080043144

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

0062743018
-7R (0411)                          Page 2 of 3          Initials:              Form 3150 1/01

1

2                                    20080043144

3

4

5

6

7        BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained
         in this PUD Rider.

8

9        _____ (Seal)        _____ (Seal)
         SANDRA WILTCHER            -Borrower                              -Borrower

10

11       _____ (Seal)        _____ (Seal)
                                   -Borrower                              -Borrower

12

13

14       _____ (Seal)        _____ (Seal)
                                   -Borrower                              -Borrower

15                                 Unofficial Document

16       _____ (Seal)        _____ (Seal)
                                   -Borrower                              -Borrower

17

18       0062743018

19       -7R (0411)                     Page 3 of 3                   Form 3150 1/01

20

21

22

23

24

25

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT B

CORPORATE ASSIGNMENT OF DEED OF TRUST ASSIGNMENT 1

**Unofficial Document**

PREPARED BY SECURITY CONNECTIONS, INC.
WHEN RECORDED MAIL TO:
**SECURITY CONNECTIONS INC.
240 TECHNOLOGY DRIVE
IDAHO FALLS, ID 83401
PH:(208)528-9895
ATTN: TERRILL NIELSON**

**ARIZONA**
COUNTY OF   **MARICOPA**
LOAN NO.   **0062743018**

2012-0567762 06/28/12 02:54 PM
18 OF 53

## CORPORATION ASSIGNMENT OF DEED OF TRUST

FOR THE VALUE RECEIVED, **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**
**SOLELY AS NOMINEE FOR FIRST HORIZON HOME LOANS, A DIVISION OF FIRST TENNESSEE BANK** located at
**N.A. ITS SUCCESSORS AND ASSIGNS,**
**P.O. BOX 2026, FLINT, MI 48501-2026** here by grants,
assigns, and transfer to **METLIFE HOME LOANS, A DIVISION OF METLIFE BANK, N.A.**

located at
**4000 HORIZON WAY   IRVING, TX 75063**
all beneficial interest under that certain Deed of Trust dated **JANUARY 10, 2008**
and executed by **SANDRA WILTCHER, AN UNMARRIED WOMAN**

to **ARIZONA TITLE**
Trustee and recorded on **JANUARY 16, 2008**, as Instrument **20080043144**
or Docket _____, at Page _____, in the Office of the County Recorder of
**MARICOPA** County, Arizona, and legally describing the trust property as:
DESCRIBED ON SAID DEED OF TRUST REFERRED TO HEREIN.

Together with all rights accrued or to accrue under said Deed of Trust.
Dated this 20th day of   **MAy , 2012**

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. SOLELY AS NOMINEE
FOR FIRST HORIZON HOME LOANS, A DIVISION OF FIRST TENNESSEE BANK
N.A. ITS SUCCESSORS AND ASSIGNS**

By   Esperanza Villegas
**Esperanza Villegas**
**ASSISTANT SECRETARY**

STATE OF   **TEXAS**                )                          COUNTY OF **DALLAS**                )
On _____ 5/20/12 _____, before me, the undersigned, a Notary Public
personally appeared _____ Esperanza Villegas _____ known to me to be the person who
executed the within Instrument as the **ASSISTANT SECRETARY**
_____ of the corporation that executed the within instrument and
acknowledged to me that the Corporation executed the within instrument pursuant to its
by-laws or a resolution of its board of directors.
WITNESS my hand and official seal.

*Jason Aaron Huff*
**Jason Aaron Huff**
NOTARY PUBLIC

JASON AARON HUFF
Notary Public, State of Texas
My Commission Expires
June 30, 2016

(NMRI.AZ) C=s.003.0671          J=m18070111ai.s.18169
P=S.002.00024.186                      MIN 100065200627430186  MERS PHONE: 1-888-679-6377

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT C
2ND CORPORATE ASSIGNMENT OF DEED OF TRUST

# Unofficial
# Document

PREPARED BY SECURITY CONNECTIONS, INC.
WHEN RECORDED MAIL TO:
SECURITY CONNECTIONS INC.
240 TECHNOLOGY DRIVE
IDAHO FALLS, ID 83401
PH:(208)528-9895
ATTN: TERRIL NIELSON
**ARIZONA**

2012-0647929 07/24/12 08:32 AM
6 OF 48

COUNTY OF  *MARICOPA*
LOAN NO.   0062743018

## CORPORATION ASSIGNMENT OF DEED OF TRUST

FOR THE VALUE RECEIVED, *MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.*
*SOLELY AS NOMINEE FOR FIRST HORIZON HOME LOANS, A DIVISION OF FIRST TENNESSEE BANK*
*N.A. ITS SUCCESSORS AND ASSIGNS,* located at
*P.O. BOX 2026, FLINT, MI 48501-2026* here by grants,
assigns, and transfer to *METLIFE HOME LOANS, A DIVISION OF METLIFE BANK, N.A.*

located at
*4000 HORIZON WAY  IRVING, TX 75063*
all beneficial interest under that certain Deed of Trust dated *JANUARY 10, 2008*
and executed by *SANDRA WILTCHER, AN UNMARRIED WOMAN*

to *ARIZONA TITLE*
Trustee and recorded on  *JANUARY 16, 2008*  , as Instrument *20080043144*  .
or Docket  , at Page  , in the Office of the County Recorder of
*MARICOPA*  County, Arizona, and legally describing the trust property as:
DESCRIBED ON SAID DEED OF TRUST REFERRED TO HEREIN.

Together with all rights accrued or to accrue under said Deed of Trust.
Dated this 12th day of *July, 2012*  .

*MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. SOLELY AS NOMINEE*
*FOR FIRST HORIZON HOME LOANS, A DIVISION OF FIRST TENNESSEE BANK*
*N.A. ITS SUCCESSORS AND ASSIGNS*

By *Esperanza Villegas*
**Esperanza Villegas**
**ASSISTANT SECRETARY**

STATE OF *TEXAS* )
On  *JUL 1 2 2012*  )       COUNTY OF *DALLAS* )
 , before me, the undersigned, a Notary Public
personally appeared  **Esperanza Villegas**  known to me to be the person who
executed the within instrument as the *ASSISTANT SECRETARY*
of the corporation that executed the within instrument and
acknowledged to me that the Corporation executed the within instrument pursuant to its
by-laws or a resolution of its board of directors.
WITNESS my hand and official seal.

**JASON AARON HUFF**
Notary Public, State of Texas
My Commission Expires
June 30, 2015

*Jason Aaron Huff*
NOTARY PUBLIC

(NMRI.AZ) C=s.003.0671        J=m18070111a1.s.18169
P=s.002.00024.186                MIN 10008520062743018G  MERS PHONE: 1-888-679-6377

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT D
SUBSTITUTION OF TRUSTEE

Unofficial

²⁰Document

12
mc

RECORDING REQUESTED BY   ServiceLink

AND WHEN RECORDED MAIL TO

QUALITY LOAN SERVICE CORPORATION

2141 5th Avenue

San Diego, CA  92101

619-645-7711

---

T.S. No.: AZ-12-525662-BN                    Space above this line for recorder's use only
Title Order No.: 1266394
MERS Telephone No. 1-888-679-6377        MERS MIN No.: 100085200627430186

## Notice of Substitution of Trustee

The undersigned present beneficiary hereby appoints **QUALITY LOAN SERVICE CORPORATION**,
a California Corporation as successor trustee under the trust deed executed by **SANDRA WILTCHER,
AN UNMARRIED WOMAN** as trustor, in which **MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS INC., AS NOMINEE FOR FIRST HORIZON HOME LOANS, A DIVISION OF
FIRST TENNESSEE BANK N.A.,**  is named beneficiary and **ARIZONA TITLE** as trustee, and
recorded 1/16/2008, in MARICOPA County as instrument number **20080043144**          and legally
describing the trust property as:


LOT 349, TWELVE OAKS II, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE
COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 287 OF
MAPS, PAGE 43.

The successor trustee appointed herein qualifies as a trustee of the trust deed in the trustee's capacity as a
licensed Arizona escrow agent as required by Arizona Revised Statutes section 33-803, subsection A.

20120771238

T.S. No.: AZ-12-525662-BN

Dated this _22ᴺᴰ_ day of _August_, _2012_

MetLife Home Loans, a division of MetLife Bank, N.A.

By: _Marilyn Morgan_          Limited Vice President

State of: _Texas_

County of: _Dallas_

On _August 22, 2012_ before me, _Pat Klement_ a notary public, personally appeared _Marilyn Morgan_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.          (Seal)

Signature _Pat Kliment_

PAT KLEMENT
MY COMMISSION EXPIRES
April 8, 2013

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT E
NOTICE OF TRUSTEE SALE

**Quality Loan Service Corp.**
**2141 5th Avenue**
**San Diego, CA 92101**



7103 7628 5941 9965 8497

AZ-12-525662-BN
Tenant/Occupant
5045 W CHICAGO CIRCLE SOUTH
CHANDLER, AZ 85226





PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 53-

1
2
3
4
5
6
7
8

Recording requested by:

When recorded mail to:

Quality Loan Service Corporation
2141 5th Avenue
San Diego, CA 92101

TS No.: AZ-12-525662-BN                                                    Space above this line for recorders use
Order No.: 1266394

## Notice of Trustee's Sale

The following legally described trust property will be sold, pursuant to the power of Sale under that certain
Deed of Trust dated 1/10/2008 and recorded 1/16/2008 as Instrument 20080043144,        in the office of
the County Recorder of MARICOPA County, Arizona at public auction to the highest bidder:

| | |
|---|---|
| Sale Date and Time: | 12/10/2012 at 12:30:00 PM |
| Sale Location: | At the main entrance of the Superior Court Building, 201 West Jefferson, Phoenix, AZ 85003 |
| Legal Description: | LOT 349, TWELVE OAKS II, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 287 OF MAPS, PAGE 43. |
| Purported Street Address: | 5045 W CHICAGO CIRCLE SOUTH , CHANDLER, AZ 85226 |
| Tax Parcel Number: | 301-88-644 |
| Original Principal Balance: | $186,200.00 |
| Name and Address of Current Beneficiary: | MetLife Home Loans, a division of MetLife Bank, N.A. C/O MetLife Home Loans a division of MetLife Bank NA 1555 W. Walnut Hill Lane Suite 200 Irving, TX 75038 |
| Name(s) and Address(s) of Original Trustor(s): | SANDRA WILTCHER, AN UNMARRIED WOMAN 5045 WEST CHICAGO CIRCLE SOUTH, CHANDLER, AZ 85226 |
| Name and Address of Trustee/Agent: | Quality Loan Service Corporation 2141 5th Avenue, San Diego, CA 92101 Phone: (866)-645-7711 Sales Line: 714-573-1965 Login to: www.priorityposting.com AZ-12-525662-BN |

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 54-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The successor trustee qualifies to act as a trustee under A.R.S. §33-803(A)(1) in its capacity as a licensed Arizona escrow agent regulated by the Department of Financial Institutions.

If the sale is set aside for any reason, including if the Trustee is unable to convey title, the Purchaser at the sale shall be entitled only to a return of the monies paid to the Trustee. This shall be the Purchaser's sole and exclusive remedy. The purchaser shall have no further recourse against the Trustor, the Trustee, the Beneficiary, the Beneficiary's Agent, or the Beneficiary's Attorney.

If you have previously been discharged through bankruptcy, you may have been released of personal liability for this loan in which case this letter is intended to exercise the note holders right's against the real property only.

**THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit report agency if you fail to fulfill the terms of your credit obligations.

Dated:                                    QUALITY LOAN SERVICE CORPORATION


By: Vanessa Sisk, Assistant Secretary

State of: **California**      )
                              ) ss
County    of:    **San**  )
**Diego**

On _____ before me, _____, a notary public, personally appeared **Vanessa Sisk**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under *PENALTY OF PERJURY* under the laws of the State of **California** that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 55-

1
2
3
4



5
6

2141 5th Avenue • San Diego, CA 92101 • 619-645-7711

7    8/30/2012

ServiceLink-Irvine
8    250 Commerce, 2nd Floor
Irvine, CA 92602

9    Attn: Vangie Ortega

10    TS No.:        AZ-12-525662-BN
Order No.:      1266394
11    Investor Name:  FHLMC-ARC-FLX9-152679

12
Enclosed herewith please find the following document(s) in which we ask that you record.

13        **X**    **Notice of Trustee's Sale   Please record NTS on the 1st possible day following**

14
Please forward an invoice for any recording charges.

15
Thank you,

16
17    _____

**Vanessa Sisk**

18
19
20
21
22
23
24
25
26

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 56-

1

2

3

4

## STATEMENT OF BREACH OR NON-PERFORMANCE

5

|||||||||||||||||||||||||||||

TS No.:   **AZ-12-525662-BN**

6

7

NOTICE IS HEREBY GIVEN that a breach or non-performance of the Trust Deed mentioned in the "Notice of Trustee's Sale" to which this Statement of Breach or Non-Performance is attached has occurred. The nature of such breach of non-performance is as follows:

8

9

10

The installments of principal and interest which became due on 5/1/2012, and all subsequent installments of principal and interest through the date of this Notice, plus amounts that are due for late charges, delinquent property taxes, insurance premiums, advances made on senior liens, taxes and/or insurance, trustee's fees, and any attorney fees and court costs arising from or associated with the beneficiaries efforts to protect and preserve its security, all of which must be paid as a condition of reinstatement, including all sums that shall accrue through reinstatement or pay-off. Nothing in this notice shall be construed as a waiver of any fees owing to the Beneficiary under the Deed of Trust pursuant to the terms of the loan documents.

11

Beneficiary represents the address of the property in default as:

Purported Street Address:     5045 W CHICAGO CIRCLE SOUTH , CHANDLER, AZ 85226

12

The Beneficiary elects to sell or cause to be sold such property under the Trust Deed.

13

Dated: 8/30/2012                                    MetLife Home Loans, a division of MetLife Bank, N.A. , by
                                                    Quality Loan Service Corp., as agent

14

15

_____
Vanessa Sisk, AZ FC Support Processor

16

IF YOUR PROPERTY IS IN FORECLOSURE because you are delinquent in payments, it may be sold without any court action as stated in the enclosed Notice of Trustee's Sale.  You have the legal right to bring your account in good standing by paying all your past due payments plus permitted costs and expenses before 5:00 p.m. mountain standard time on the last day other than a Saturday or legal holiday before the date of sale or the filing of an action to foreclose the trust deed.

17

18

IF YOUR INTEREST IN THE TRUST PROPERTY IS SUBORDINATE in priority to that of the Deed of Trust, being foreclosed your interest may be subject to being terminated by the Trustee's Sale.

19

To find out the amount you must pay or to arrange for payment to stop the foreclosure or if your property is in foreclosure for any other reason, contact:

20

MetLife Home Loans a division of MetLife Bank NA
1555 W. Walnut Hill Lane
Suite 200
Irving, TX 75038

21

800-364-7662

22

23

24

25

26

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 57-

1

EXHIBIT F
DEFENDANT METLIFE DELINQUENT NOTICE

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT G
DEFENDANT METLIFE MORTGAGE IN DEFAULT NOTICE

**MetLife**
MetLife Home Loans
a Division of MetLife Bank, N.A.

MAIL CODE 6051
1555 W. WALNUT HILL LANE
SUITE 200
IRVING TX 75038

July 02, 2012

52862 0000509 001
Sandra Wiltcher
5045 W Chicago Cir S
Chandler, AZ 85226-3603

| | |
|---|---|
| Loan Number: | 0062743018 |
| Property Address: | 5045 W Chicago Circle South |
| | Chandler AZ 85226 |
| Total Amount Due: | $ 4,183.65 |

## MORTGAGE IN DEFAULT TWO MONTHS

PLEASE NOTE THAT THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. IF YOUR DEBT WAS DISCHARGED IN A CHAPTER 7 BANKRUPTCY AND YOU DID NOT REAFFIRM, WE ARE NOT SEEKING PERSONAL LIABILITY ON THE NOTE. WE ARE PURSUING OUR RIGHTS AGAINST THE PROPERTY AS PROVIDED IN THE SECURITY AGREEMENT, WHICH MAY INCLUDE FORECLOSURE.

MetLife Home Loans wishes to notify you that your mortgage loan is 2 months delinquent. If your loan remains delinquent past the last day of this month, your mortgage loan will be referred to foreclosure.

Please send 2 payments, plus late charges today, to bring your loan current. By doing so, you avoid the possible foreclosure of your loan.

If your payment is received more than 30 days after the loan due date, the status of your loan may be reported to the credit bureaus. We may engage a field representative to contact you to conduct a face-to-face interview regarding your delinquency. There is a fee for the inspection service performed to interview you about your loan.

If you are unable to pay your mortgage payment and would like credit counseling information, please call the Department of Housing and Urban Development (HUD) at 1-800-569-4287.

Unexpected life changes can cause a disruption in making your mortgage payment. If you are unable to bring your loan current, please call MetLife Home Loans to discuss possible alternatives. Its farther, you may contact our Home Retention Contact Center toll free at 1-866-638-8964, Monday – Friday, 7 a.m. – 8 p.m. CT.

Some of the programs you may qualify for are:

1.     **Repayment Plan:** A written agreement where you would be able to begin making your regular monthly payments, in addition to a portion of your past-due payment each month.

2.     **Loan Modification:** If you do not have the ability to bring your loan current but you can make payments on your loan, we may be able to modify your original mortgage terms.

Under certain circumstances, we may be able to reduce your interest rate, extend the term of your loan, or add the delinquent interest amount to the unpaid principal balance.

3.     **Partial Claim Advance:** If your mortgage is HUD insured, you may qualify for an interest free loan from HUD to make your loan current.

EXHIBIT H
FREDDIE MAC NOTICE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



July 5, 2012

SANDRA WILTCHER
5046 WEST CHICAGO CIRCLE SOUTH
CHANDLER, AZ 85226

RE: Your Mortgage Loan #: 02743018

Dear Homeowner,

At Freddie Mac, we help make homeownership a reality for 10,000 people each day. But our commitment to you doesn't end with the purchase of a house. We're also committed to helping you keep your home and protecting your investment.

Freddie Mac is the owner of your mortgage and METLIFE services the mortgage for us. We understand that your mortgage payment has recently been delinquent, and our experience tells us that many homeowners can be helped if homeowners act quickly.

On our website, you can find information about the options that may be available to help you. Type the address below into your browser.

http://www.freddiemac.com/avoidforeclosure/

In addition, we'd like you to know that there are two foreclosure prevention events going on in your area:

- The Freddie Mac Borrower Help Centers and the Arizona Foreclosure Prevention Task Force are hosting a Home Rescue Clinic in Tempe on Saturday, July 14.

- The U.S. Department of the Treasury and the HOPE NOW alliance are hosting a foreclosure prevention event in Phoenix on Thursday, July 19.

These events are FREE and available to you. Please see the enclosed flyers for details about the events.

If your mortgage servicer is at the event, this will be a unique opportunity for you to discuss your situation so you should register at the event to meet them.

If your mortgage servicer is not at the event, additional services such as one-on-one housing counseling and State and Local services may be available to assist you.

Please bring this letter with you to the event.

Sincerely,

*Freddie Mac Borrower Outreach*

**Beware of third parties who offer to help you avoid foreclosure by charging you a fee because they may be scammers.** Report suspected scammers by phone at 1-888-995-HOPE or online at http://lcintake.service.nw.net/intake-Application/StartIntake.do

Notice to any recipient who has (a) filed bankruptcy or (b) received a discharge in bankruptcy. Please be advised that this letter constitutes neither a demand for payment of the captioned debt nor a notice of personal liability to any recipient who may have received a discharge of such in accordance with the Bankruptcy Code and in violation of the automatic stay of section 362 of the bankruptcy code.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT I
PLAINTIFFS QWR, NOTICE OF DISPUTE

1

2  NOTICE OF DISPUTE
   Served by Fax: 214-441-4598

3  Sandra D. Wiltcher                                    August 9, 2012
   5045 W. Chicago Circle S
4  Chandler, AZ 85226

5  Met Life Home Loans
   1555 W. Walnut Hill Lane Suite 200
6  Irving, Texas 75038

7  Met Life Loan No: 0062743018

8  MET Life,

9          Met Life, I have obtained some alarming evidence of possible fraud with regards
   to your claimed interest in my mortgage. As I audited the county records I have noticed
10 two Assignments of Deed of Trust done on various days, but purportedly for the same
   purpose. Notwithstanding, the purported assignments appear to be a common activity in
11 the age of mortgage fraud. My research has discovered that Met Life received only
   servicing rights from First Horizon, yet the assignments alleges Met Life is an alleged
   creditor.

12
           Based on these and other evidence, I exercise my right to receive from you the
13 information requested. This should not be taken as my position to avoid any legal
   obligation, or default on my mortgage obligation. However it is my fiduciary duty to
14 ensure that my payment is being credited properly, and that the party receiving, and
   demanding payments actually are entitled to those payments.

15
           I am filing this Request for Information pursuant to 15 U.S.C.§1641(g), 15
16 U.S.C.§1692, and 12 U.S.C. §1605. As it stands 15 U.S.C 1641(g) requires a 5 day
   response followed by a 20 day deadline for completion of the requested information.

17         It is important that I receive that information enclosed, as it is not only required
   but as well needed for me to have the facts regarding this debt. Further the information is
18 important as I have received substantial conflicting information, mainly regarding the
   alleged amount owing. In addition I am required to know other pertinent information
19 regarding the alleged creditor and servicer. Please do not respond with copies of
   publically recorded documents that I am already in possession of, such as Deed of Trust,
20 etc. Please also provide a certified copy of the Original Promissory Note front and back,
   in its present condition.

21         As previously mentioned I have no problem bringing my payments current once I
22 am provided proof of your position as alleged creditor.

23         The following information is required;

24     1.  **Clearly identify** *the current creditor, servicer, note owner, note holder, and*
           *any derivative thereof;*

25 SANDRA WILTCHER NOTICE OF DISPUTE AND REQUEST FOR VALIDATION

26

NOTICE OF DISPUTE
Served by Fax 214-441-4598

2.  **Please clearly identify** the date when the loan was acquired by Met Life, the amount paid, and whether the loan was acquired by any or all parties, *after the alleged default?*

3.  Clearly state whether any party that alleges an interest in my property, alleged loan, mortgage or lien interest, are considered "debt collectors" as defined by the consumer laws of the state of New York, and under the FDCPA

**Please clearly answer** whether MetLife is a creditor or debt collector, buyer?
a.  Has this loan ever been securitized? If yes provide the REMIC information.
b.  Please provide the current Reinstatement/Payoff Amount?
c.  Please provide a complete payment history of all payments, credits and debits?
d.  What was the purchase price paid for the account by Met Life?

These are very specific requests, however I request that you also provide the additional information in compliance with the specifics laws.

Respectfully,
/s/ Sandra Wiltcher
(877) 916-6637 fax

SANDRA WILTCHER NOTICE OF DISPUTE AND REQUEST FOR VALIDATION

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT J
PLAINTIFFS SECOND QWR, AND NOTICE OF DISPUTE

USPS FIRST CLASS MAIL

Metlife Home Loans
1555 West Walnut Hill Lane
Suite 200
Irving, Texas 75038

Homeowner: Sandra Wiltcher
5045 W Chicago Cir S
Chandler, AZ  85226-3603

Loan No: 0062743018

***October 9, 2012***

Dear Sir/Madam:

This is a Qualified Written Request (QWR) as defined by the Real Estate
Settlement Procedures Act (RESPA) for information regarding the mortgage loan as
referenced above. In addition, this is also a request made pursuant to Section 404 (b) of
Public Law 111-22, Section 404(b) for the name, address and telephone number of the
holder and owner of the Mortgage Note and for the same information with respect to
the Master Servicer of the obligation, as well as Public Law 107-56, 115 Stat. 272
(U.S.A. P.A.T.R.I.O.T. Act). Please note that your failure to respond to this request may
result in a civil action by me pursuant to Section 1641(f) of Title 15 of the United States
Code. If Bank of America is considered a debt collector as defined in 15 USC 1692,
then this notice will be considered a "debt validation" dispute.

By my signature below, I authorize you to furnish me with the requested
information, and any other information regarding the above account and mortgage loan.

I am sending you this new QWR because I desire current information regarding
my loan, as to the current owner, servicer, payments, amounts due, and complete loan
history.

SANDRA WILTCHER QUALIFIED WRITTEN REQUEST                    1

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 68-

USPS FIRST CLASS MAIL

It is unclear as to: i) who is the current **holder in due course** and owner of the original mortgage note; ii) who is the current **Trustee** and how they became Trustee; iii) who is the current **Beneficiary** and how they became Beneficiary; iv) how the **alleged** loan was funded and by whom; v) whether money was laundered by the purported 'funders' to fund terrorists activities; vi) where the funds to finance the alleged loan were obtained from; vi) who the funds to finance the **alleged** loan were obtained from.

Therefore it is requested that you resolve this uncertainty and dispute by providing me with the following information.

You are required to:

1. Pursuant to the U.S.A. P.A.T.R.I.O.T. Act, provide me the accounting and flow of all money as well as the source of funds related to this **alleged** loan.

2. Provide the Committee on Uniform Security Identification Procedures ("CUSIP") number for the loan application pertaining to this **alleged** loan;

3. Provide any and all CUSIP numbers pertaining to this **alleged** loan;

4. A complete and original life of the **alleged** loan transaction history prepared by the Servicer from its own records using its own system and default servicing personnel;

5. A copy of your Key Loan transaction history, bankruptcy work form, or XLS spreadsheet of all accounts associated with this mortgage **alleged** loan;

6. The Transaction Codes related to the **alleged** loan referenced herein;

7. The Code definitions in plain English;

8. A copy of the MERS MIN Summary and Milestone Reports.

SANDRA WILTCHER QUALIFIED WRITTEN REQUEST      2

1

2      USPS FIRST CLASS MAIL.

3          9. Pursuant to the Truth-In-Lending Act, identify the name, address, and

4      telephone number of the owner of my **Adjustable Rate Note** and **Security**

5      **Instrument**.

6          10. Copies of all collection notes, collection records, communication files or any

       other form of recorded data with respect to any communications between you and the

7      debtor;

8          11. An itemized statement supporting the figure claimed due and owing;

9          12. Copies of all written or recorded communications between you and any non-

10     lawyer third parties regarding this mortgage;

11         13. All P-309 screen shots of the history of all of the accounts, principal, interest,

12     escrow, late charges, legal fees, property inspection fees, broker price opinion fees,

       statutory expense fees, miscellaneous, corporate advance fees, etc., and as stated above

13     associated with the aforementioned loan.

14         14. The name and address of the owner of the Note signed by me and secured by

15     the Mortgage Security Instrument in the mortgage loan referenced above.

16         15. The name and address of the entity that legally is the "holder" of the Note

17     signed by me and secured by the Security Instrument in the mortgage loan referenced

18     above. If your answer is the same as your answer to #14 above, you may simply reply,

19     "same as #14."

20         16. The names of all entities to which the Note referenced above has been sold or

       otherwise transferred at any time, the amount the note sold or transferred for, and the

21     dates that each sale or transfer of the Note occurred.

22         17. A copy of the Note referenced above showing all endorsements that have

23     occurred, together with any allonge that exists to that Note.

24

25              SANDRA WILTCHER QUALIFIED WRITTEN REQUEST                    3

26

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 70-

1

2 USPS FIRST CLASS MAIL.

3      18. The names of all entities to which my Security Instrument has been assigned,

4 and the dates that each assignment occurred. If any assignment in blank has occurred,

5 include it and the list of dates with the notation "In Blank" in place of the name of the

entity.

6

7      19. A copy of each of the assignments reflecting each assignment referenced in

#18 above.

8

9      20. A copy of each written notice that has been sent to me informing me of the

sale or transfer or assignment of the Note or Security Instrument referenced above. You

10 need only include notices sent by you or any corporate affiliate of yours, or notices of

11 which you otherwise have actual knowledge. You need NOT include in any Notice of

Transfer of Servicing that may have been sent pursuant to RESPA. This request is only

12 for notices that have been sent in compliance with the Truth-In-Lending Act.

13

14      Thanking you in advance, I am, respectfully yours,

15

16

17

18

19                       /s/ Sandra Wiltcher

20

21

22

23

24

25      SANDRA WILTCHER QUALIFIED WRITTEN REQUEST     4

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT K
MET LIFE QWR, NOTICE OF DISPUTE RESPONSES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26



**MetLife**
MetLife Home Loans
a Division of MetLife Bank, N.A.

November 14, 2012

Sandra Wiltcher
5045 W Chicago Cir S
Chandler, AZ 85226-3603

Loan Number: 0062743018

Your investor is Freddie Mac, their contact
information is as follows:

1551 Park Run Drive, MSD50
McLean, VA 22102

Phone Number 1-800-336-3672

Please be advised that MetLife Home Loans is the servicer of your
mortgage account. Freddie Mac has entrusted MetLife Home Loans to answer
all servicing questions and/or concerns regarding your loan. While
servicing your loan, we honor and follow all mortgage guidelines as
dictated by Freddie Mac.

So that we can ensure that you receive premier customer service, we
encourage you to contact our Customer Relations Department for all of
your servicing questions and/or concerns. We are available at 1-888-
638-6964, Monday through Friday, 7 a.m. - 8 p.m. CT. You may also
contact us at www.metlifehomeloans.com.

Sincerely,

Customer Relations

CS116-003  UH4

1
2
3
4

**MetLife**
MetLife Home Loans
a Division of MetLife Bank, N.A.

5

November 15, 2012

6

Sandra Wiltcher
5045 W Chicago Cir S
Chandler, AZ 85226

7
8

RE: Sandra Wiltcher
    Property Address 5045 W Chicago Circle South
                     Chandler AZ 85226
    Loan Number       0062743018

9
10

MetLife Home Loans, a division of MetLife Bank, N.A. ("MetLife"),
acknowledges receipt of your letter concerning your mortgage loan.

11

Although it is stated that the letter constitutes a qualified written
request ("QWR") under the Real Estate Settlement Procedures Act, it
does not meet the requirements of a QWR.  According to RESPA
guidelines, a QWR identifies specific servicing errors that may or
may not have occurred.  Your letter either addresses concerns
regarding the origination of the loan and/or does not identify a
specific servicing error.  In the interest of our premier customer
service, we are providing a copy of the following documents:

12
13
14
15

- Payment history to present
- Investor Contact Information
- Note
- Recorded Deed of Trust
- HUD 1 Settlement Statement

16
17

These documents validate origination, ownership and current status of
the subject debt.  We are unable to provide copies of other documents
requested because they are contracts between MetLife and other
parties, and are internal business records.

18
19

If foreclosure proceedings have commenced on the loan in question,
they will not be halted as a result of the alleged QWR.
Additionally, such a letter does not relieve the borrower(s) from the
debt owed on the loan. As such, normal servicing of the loan will
continue according to the terms of the Note and Deed of Trust.

20
21
22
23
24
25
26

PLAINTIFF VERIFIED COMPLAINT FOR DAMAGES
- 74-

1
2
3
4
5

**MetLife**
MetLife Home Loans
a Division of MetLife Bank, N.A.

Page 2

6
7
8

Please be advised that federal Privacy Laws prohibit the release of
borrower's information to a third party without a borrower's signed
Letter of Authorization (LOA). A LOA does not authorize 3rd parties
to alter the mortgage account information without borrower's consent.
It is used for informational purposes only. If a LOA is not on file
by the date of this letter, information will only be sent to the
subject borrower.

9
10

We pride ourselves on providing premier customer service. If you have
any additional questions or concerns regarding this information,
please feel free to contact Customer Relations at 1-888-638-6964,
Monday - Friday 7 a.m. - 8 p.m. CT. You may also send us an email
via our website, www.melifehomeloans.com.

11
12

Sincerely,

13

Customer Relations

14
15
16

CS118-012  UH4

17
18
19
20
21
22
23
24
25
26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

EXHIBIT L
LEGAL PROPERTY DESCRIPTION

1  LOT 349, TWELVE OAKS II, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE
   OF THE COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK
2  287 OF MAPS, PAGE 43.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

1

**CERTIFICATION OF SERVICE**

2    I, E. Scott certify that on December 7, 2012, a copy of the Summons and the

3    Complaint to the following defendants:

4

5    FREDDIE MAC
     8200 JONES BRANCH DRIVE

6    MCLEAN, VA 22102-3110

7
     METLIFE BANK N.A.
8    D/B/A METLIFE HOME LOANS
     4000 HORIZON WAY
9    IRVING, TEXAS 75063

10

11   QUALITY LOAN SERVICE CORPORATION
     5141 5TH AVENUE
12   SAN DIEGO, CA 92102

13

14

15

16

17

18

19

20

21

22

23

24

25

26